

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNIE WIMBUSH #360-137       *
      Plaintiff,

v.       * CIVIL ACTION NO. JKB-11-1916

DR. MATERA, et al.       *
      Defendants

## MEMORANDUM

On July 11, 2011, Ronnie Wimbush, then incarcerated at North Branch Correctional Institution in Cumberland, Maryland ("NBCI"),[1] filed a civil rights action seeking money damages and alleging that two employees of the contractual medical provider for Eastern Correctional Institution ("ECI"), where Wimbush was formerly incarcerated, failed to provide adequate medication to relieve his severe and chronic pain.[2] ECF No. 1. Now pending is a Motion to Dismiss or, in the Alternative, for Summary Judgment filed on behalf of defendants Paul Matera, M.D., and Peter Stanford, PAC (ECF No. 11), which shall be construed as a motion for summary judgment filed pursuant to Fed. R. Civ. P. 56,[3] and Wimbush's opposition thereto.

---

[1] Although Wimbush lists Eastern Correctional Institution as his address on the complaint, the envelope indicates he is incarcerated at North Branch Correctional Institution. Wimbush was transferred from ECI to NBCI on June 8, 2011, two months after he was charged in Somerset County Circuit Court with second-degree assault stemming from an incident at ECI. See
http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=19K11009651&loc=47&detailLoc=K

[2] Wimbush has been denied leave to amend the complaint to include claims against medical personnel at NBCI. See Order of November 29, 2011, docketed as ECF No. 18. As leave to amend the complaint has been denied, defendants' motion to sever those claims (ECF No. 16) shall be denied as moot. To the extent Wimbush seeks to further amend his complaint concerning mail irregularities at NBCI (see correspondence docketed as ECF No. 20), such amendment is denied. Wimbush is, however, free to file a new action concerning NBCI mail problems. As he has never named "Ms. Warwick" in this case, his request to voluntarily dismiss her (see correspondence docketed as ECF No. 21) is denied.

[3] The dispositive pleadings will be treated as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure because materials outside the four corners of the pleadings have been considered. See Bosiger v. U.S. Airways, 510 F.3d 442, 450 (4th Cir. 2007).

ECF No. 19. Although further supplementation will be needed, a hearing is not necessary at this time.[4] Local Rule 105.6 (D. Md. 2011).

## Background

On June 15, 2008, Wimbush was admitted to the University of Maryland Medical System's Shock Trauma Unit ("UMMS" or "Shock Trauma") for surgical repair of a severely broken leg and ankle sustained when he leaped from a burning building. ECF No. 11, Exhibit B at 1 and 3. At the time of his injury Wimbush, a Baltimore resident,[5] was a heroin user. After surgery, hospital staff counseled Wimbush on substance abuse treatment options. *Id.*, Exhibit B at 1. On June 17, 2008, he was discharged from UMMS to begin rehabilitation. *Id.*, Exhibit B at 4. At the time of discharge medical personnel, who were aware of Wimbush's addiction, provided him with numerous medications, including MS Contin[6] (a narcotic used to treat moderate to severe pain), baclofen[7] (a non-narcotic used to relieve muscle spasms and cramps associated with spinal cord injury), pregabalin[8] (brand name Lyrica, used to treat neuropathic pain often associated with diabetes or fibromyalgia), and oxycodone[9] (a narcotic similar to morphine used to treat moderate to severe pain) for breakthrough pain.[10] *Id.* On July 1, 2008,

---

[4] For reasons set forth in the previous Order of November 30, 2011 (docketed as ECF No. 18), Wimbush's other request for appointment of counsel (ECF No. 4) shall be denied.

[5] Wimbush's residence is established based on addresses on file in connection with criminal cases then pending in the Baltimore City and Baltimore County courts. *See* http://casesearch.courts.state.md.us/inquiry/inquirySearch.jis

[6] *See* http://www.drugs.com/ms_contin.html.

[7] *See* http://www.bing.com/search?q=ls+Baclofen+a+Narcotic&FORM=QSRE1.

[8] *See* http://www.pfizerpro.com/hcp/lyrica.

[9] *See* http://www.drugs.com/oxycodone.html

[10] Other prescribed medications included Lovenox (to prevent deep vein thrombosis and blood clots in the lung), *see* http://www.bing.com/search?q=Lovenox&src=IE-SearchBox, Dulcolax and senna (to relieve constipation), *see* http://www.dulcolaxusa.com/?sc=DLXACQWEBSEMYAH1112034&utm_source=bing&utm_medium=cpc&utm_term=about_dulcolax&utm_campaign=decision_-_branded and http://www.bing.com/health/article/goldstandard-

2

Wimbush returned to UMMS for additional surgery on his fracture. *Id.*, Exhibit B at 6. Substance abuse consultation was provided. At time of discharge Wimbush was continued on Lovenox, baclofen, Lyrica, MS Contin, and oxycodone. Tylenol (for pain or fever) and Colace (for constipation) also were prescribed. *Id.*, Exhibit B at 6.

It is unclear whether these medications were prescribed on a short-term basis or were subject to renewal for an extended period of time. What is known is that when Wimbush entered the Maryland Division of Correction's ("DOC") Maryland Reception Diagnostic Classification Center ("MRDCC") on April 26, 2009, prison medical personnel noted his five-month stay at UMMS; noted Wimbush's last doses of oxycodone and morphine had been taken two days before; indicated the UMMS records would be needed; referred Wimbush to the chronic care clinic; requested he be provided a bottom bunk; and offered Wimbush Tylenol and Motrin to control chronic pain. *Id.*, Exhibit B at 8-9. The next day, Wimbush complained of chronic pain and requested an x-ray of his leg (which he claimed was injured when he was thrown into a police car) and medications, including Lyrica. *Id.*, Exhibit B at 10. Wimbush was examined, provided a cane and x-ray, and prescribed Tylenol with codeine. *Id.*, Exhibit B at 12.

Wimbush next complained of pain in late November and early December, 2009. He was permitted to wear his own tennis shoes to support his right ankle. He refused to appear for sick call on December 2, 2009. On December 9, 2009, he was transferred from MRDCC to ECI.

Within the first week after transfer, Wimbush submitted five sick call slips complaining of chronic pain in the right ankle. On December 22, 2009, defendant Stanford, a physician's assistant, evaluated Wimbush and told him he would be evaluated for pain management. *Id.*, Exhibit B at 22. On January 5, 2012, Wimbush again complained of pain. On January 19, 2012,

---

GS1234/Senna-tablets?q=senna&qpvt=Senna, and ranitidine (to relieve heartburn), *see* http://www.bing.com/search?q=ranitidine&src=IE-SearchBox.

Certified Registered Nurse Practitioner Frances Morthole evaluated Wimbush, who complained of daily pain with a severity of eight out of ten (ten being the worst). Wimbush told Morthole he used a cane, wore special high-top orthopedic shoes, and used an ankle brace prior to incarceration. Morthole told Wimbush his shoes and boots should be properly laced at all times to provide support and that while he did not need a brace, she would order a pair of high-topped boots to provide support. She prescribed Naprosyn, a non-steroidal anti-inflammatory medication ("NSAID") for pain. On February 2, 2010, Morthole again met with Wimbush, who indicated Naprosyn did not help his pain. Morthole referred Wimbush to a physician's assistant for further evaluation and pain management. *Id.*, Exhibit A, ¶ 7, Exhibit B at 24-27.

On February 20, 2010, Physician's Assistant Maryam Messforosh found Wimbush had limited range of motion in the right ankle and a decreased arch in that foot. She continued Naprosyn for pain and told Wimbush to order an arch support. *Id.*, Exhibit B at 28.

In response to continued complaints of pain, Nurse Morthole on March 3, 2010, prescribed Neurontin,[11] a medication used to treat neurologic and chronic pain. *Id.*, Exhibit B at 30. By the end of the month, Wimbush submitted a sick call slip indicating the medication was not working. Defendant Matera, a physician, increased Wimbush's dosage of Neurontin and advised him to begin an exercise program but refrain from lifting heavy weights. On April 20, Matera recommended a bottom bunk and an elastic bandage to stabilize the ankle. *Id.*, Exhibit B at 31-35. Wimbush later informed Matera that Neurontin helped his pain. On June 1, 2010, Matera increased the daily Neurontin dosage. *Id.*, Exhibit B at 36-37. Wimbush was provided ice after complaining of swelling. On June 25, 2010, he requested an ankle brace. On July 6, 2010, Nurse Morthole noted Wimbush's report of continuing pain despite the use of Neurontin

---

[11] Also known as gabapentin, this drug is similar, but not identical, to pregabalin (Lyrica). *See* http://www.bing.com/health/article/goldstandard-GS1502/Gabapentin-oral-solution?q=neurontin&qpvt=Neurontin.

4

and Naprosyn and further noted his request for an ankle brace. Morthole discussed the brace with Matera who indicated it was not needed. Wimbush's Naprosyn prescription expired the following day and was not renewed. *Id.*, Exhibit B at 38-42.

On July 31, 2010, Wimbush submitted a sick call slip complaining of pain. During his August 3, 2010, appointment with Matera he requested different, lighter shoes and told Matera that Lyrica had helped control his pain in the past. Wimbush had some swelling of the right foot with somewhat limited range of motion but indicated he was able to attend school and perform range-of-motion exercises and a home exercise program. He was advised not to participate in sports or yard activities and to continue the exercises. Matera prescribed Lyrica twice daily. *Id.*, Exhibit B at 43-46. Despite the fact that Matera (and later Dr. Lino Quilo) prescribed Lyrica, the medication, which is considered "non-formulary," was denied by the Regional Medical Director.[12] *Id.*, Exhibit A, ¶¶ 11-12.

On October 3, 2010, Wimbush submitted sick call slips complaining of pain, requesting Lyrica, and requesting to see a doctor. On October 8, 2010, the Pain Committee, consisting of Wimbush's treating physician, the statewide medical director, the associate medical director, and ECI's medical director, denied Wimbush's continued treatment with Lyrica. *Id.*, Exhibit A, 13.[13]

Wimbush continued to submit sick call slips complaining of pain. On his September 25, 2010, sick call slip he asked that his Lyrica prescription be continued as it was the only medication that helped, and stated that he would forego all other pain medications. *Id.*, Exhibit B at 52. He was seen by a nurse on November 7, 2010, and by Stanford on November 8 and 10,

---

[12] It appears Wimbush received Lyrica for approximately sixty days between August 3 and October 3, 2010. *Id.*, Exhibit B at 46-47.

[13] Defendants state that Lyrica has the same effects as Neurontin, and that at the time Lyrica was denied, Wimbush's Neurontin prescription was still in effect. *Id.*, Exhibit A, ¶ 13. The court notes, however, that Wimbush may have been given both Lyrica and Neurontin between September 16, 2010, through October 3, 2010. *Id.*, Exhibit B at 47.

5

2010. An x-ray taken November 10, 2010, revealed intact hardware in the ankle. *Id.*, Exhibit B at 48-56, 63; Exhibit A, ¶ 14. On December 1, 2010, Wimbush was prescribed an additional medication, Naprosyn, after he complained that pain kept him from walking around the compound. *Id.*, Exhibit B at 66-67.

Wimbush continued to complain about pain and request a specific type of ankle brace and special shoes during the first months of 2011. *Id.*, Exhibit B at 68-81. On March 10, 2011, Stanford evaluated Wimbush, increased his Neurontin dosage, provided elastic stockings to prevent thrombosis, and promised to inquire as to the type of brace Wimbush might be able to use while housed on segregation.[14] Indomethacin, another type of NSAID, was substituted for Naprosyn, and Wimbush was prescribed Tylenol. *Id.*, Exhibit B at 83-84.

On March 22, 2011, Dr. Quilo continued Wimbush's prescriptions for Neurontin and Naprosyn. *Id.*, Exhibit B at 86 and 89. Wimbush continued to complain to ECI health care providers about pain and lack of ankle support. *Id.*, Exhibit B at 90-102. He began a hunger strike on June 24, 2011, and two days later was transferred to NBCI.[15] *Id.*, Exhibit B at 103-06.

### Standard of Review

Rule 56(a) and (c) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

---

[14] Apparently the request was denied, for reason that braces are provided only for those suffering acute, rather than chronic, injuries. *Id.*, Exhibit A, ¶ 16.

[15] Wimbush returned briefly to ECI on August 14, 2011, for a court appearance. It appears he was not provided pain medication on that day. *Id.*, Exhibit B at 118-119.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

This does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)); *see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

The court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 376-77 (2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id.* at 380.

## Analysis

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). When contractual prison health care providers show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id.* at 104. The named individual "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A defendant must know of and disregard an excessive risk to inmate health or safety. "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U. S. at 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *See Miltier*, 896 F.2d at 848; *see also Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (quoting *Farmer*, 511 U.S. at 835). An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

The parties do not dispute that prior to incarceration Wimbush was an addict who sustained traumatic injury to his right leg and ankle so severe as to cause some degree of pain for

the remainder of his life.[16] Wimbush in essence complains that the ever-changing medication regimen provided during his incarceration at ECI did not control his pain. Defendants contend that the non-narcotic, formulary medications provided demonstrate that they were not deliberately indifferent to his need for pain medication, and counter that the use of narcotic medications (1) would not eliminate Wimbush's pain, and (2) cannot be provided due to the risk of addiction. Defendants further state that "at ECI, policy does not permit narcotics to be administered in the general population; narcotics can only be administered to inmates in the Infirmary." ECF No. 11, Exhibit A, ¶ 21.

The court is not persuaded that any individual must necessarily endure chronic pain or obtain appropriate relief but risk addiction to effective pain medication.[17] Here, defendants have withheld medications that previously controlled Wimbush's chronic pain based in part on their belief that he will become addicted. Other forms of pain management have not been explored. Medications that have proven somewhat effective have been abruptly withdrawn because they are considered "non-formulary." Similarly, approval for some prescribed medication that might prove efficacious has not been forthcoming due to the drugs' "non-formulary" status. Defendants have not delineated exactly who defines such status and whether provisions exist for medical care providers to override the denial of necessary drugs to ensure adequate patient care. Lastly, defendants base the denial of certain medications upon "policy." The court is unaware of a policy concerning administration of narcotic medications within the DOC or within specific

---

[16] Defendants in no way imply that Wimbush's requests for pain relief are improperly motivated.

[17] To that end, the specialty of pain management has emerged to develop treatment plans to relieve, reduce, or manage pain and help patients return to everyday activities quickly without surgery or heavy reliance on medication. To make sure all the patient's needs are met, the physician coordinates care through an interdisciplinary team of health professionals, which may include physiatrists, anesthesiologists, internists, surgeons, psychiatrists, neurologists, and/or therapists. *See generally* http://backandneck.about.com/od/chronicpainconditions/f/painmanagement.htm.

DOC institutions.[18] And, apart from medical science, logic alone raises the question whether it is appropriate to deny the Plaintiff Lyrica in particular, given his severe orthopedic history and given the success he previously enjoyed when that medicine was part of his therapy. Whether a drug is "non-formulary" carries little weight in the specific context of this case where there is powerful evidence indicating the defendant's pain is real and severe.

Defendants' dispositive motion shall be held in abeyance and defendants shall be granted an opportunity to address the concerns set forth in the preceding paragraph. Wimbush shall then be granted an opportunity to respond to defendants' additional submission. A separate order shall be entered in accordance with this Memorandum.

2/13/12
(Date)

James K. Bredar
United States District Judge

---

[18] The court takes judicial notice that Ultram (generic name tramadol), a narcotic-like medication used to treat moderate to severe pain (see http://www.bing.com/health/article/goldstandard-GS80814/Tramadol-extended-release-tablets-or-capsules?q=ultram&qpvt=ultram), was prescribed for at least one ECI prisoner suffering chronic pain. The medication was given using a "watch-take" protocol. See McGehrin v. Stanford, et al., Civil Action No. DKC-11-818 (D. Md.), ECF No. 25, Memorandum of January 20, 2012. Another DOC institution, Western Correctional Institution, has allowed narcotics such as Ultram and Nubain to be given to a prisoner with chronic back pain. See Stewart v. Joubert, et al., Civil Action No. JFM-11-427 (D. Md.), ECF No. 39, Memorandum of January 31, 2012.