**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                              |     |                            |
|------------------------------|-----|----------------------------|
| **RONNIE WIMBUSH,**          | *   |                            |
|                              | *   |                            |
| **Plaintiff,**               | *   |                            |
|                              | *   |                            |
| **v.**                       | *   | **Civil Case No. SAG-11-1916** |
|                              | *   |                            |
| **PAUL MATERA,** *et al.*,   | *   |                            |
|                              | *   |                            |
| **Defendants.**              | *   |                            |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM**

Plaintiff Ronnie Wimbush filed this 42 U.S.C. § 1983 action against Defendants Paul Matera, MD, Peter Stanford, Physician Assistant ("PA"), Corizon, Inc. ("Corizon") (collectively, "the Corizon Defendants"), and Wexford Health Sources, Inc. ("Wexford"), alleging that the Defendants violated his Eighth Amendment rights by failing to provide him with proper medical care while incarcerated in the Maryland correctional system. [ECF Nos. 1, 63]. Presently pending before the Court are cross-motions for summary judgment filed by Mr. Wimbush and the Corizon Defendants, [ECF Nos. 116, 122], and cross-motions for summary judgment filed by Mr. Wimbush and Wexford. [ECF Nos. 117, 120]. I have reviewed both sets of cross-motions, oppositions, and replies thereto. No hearing is deemed necessary. *See* Loc. R. 105.6 (D. Md. 2014). For the reasons set forth herein, Plaintiff's Motion for Summary Judgment against the Corizon Defendants will be **DENIED**, and the Corizon Defendants' Cross-Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Motion for Summary Judgment against Wexford will be **DENIED**, and Wexford's Cross-Motion for Summary Judgment will be **GRANTED**.

1

## I. BACKGROUND

Mr. Wimbush is an inmate in the Maryland correctional system.  On July 11, 2011, Mr. Wimbush commenced the instant suit *pro se* against Dr. Paul Matera and PA Peter Stanford, both of whom provided medical care to Mr. Wimbush while he was incarcerated at Eastern Correctional Institution ("ECI").  [ECF No. 1].  Mr. Wimbush alleged that Dr. Matera and PA Stanford failed to provide him with proper medical care for his severe ankle pain, in violation of the Eighth Amendment of the U.S. Constitution.  *Id.*  Dr. Matera and PA Stanford filed a motion to dismiss, or, in the alternative, for summary judgment, which Judge Bredar held in abeyance while the defendants supplemented their motion as directed by the court.  [ECF Nos. 11, 24].  On July 2, 2012, Judge Bredar denied Dr. Matera and PA Stanford's supplemental motion, and granted Mr. Wimbush's motion for appointment of counsel.[1]  [ECF No. 44].

On February 4, 2013, Mr. Wimbush, now represented by counsel, filed an amended complaint that added claims for supervisory liability and policy and custom liability against both Corizon and Wexford.  [ECF No. 63].  Corizon was the contractual medical services provider for inmates in the Maryland Department of Public Safety and Correctional Services ("DPSCS") system until July 1, 2012, and Wexford has been the contractual medical services provider for DPSCS inmates since July 1, 2012.  *Id.*  Prior to July 1, 2012, Wexford was a utilization management contractor for DPSCS.  *Id.*  Wexford filed a motion to dismiss, or, in the alternative, for summary judgment, which Judge Bredar granted in part and denied in part.[2]  [ECF Nos. 76, 85].

---

[1] Judge Bredar explained that "there [was] some question as to whether additional defendants, including the utilization contractor [Wexford], may be needed to resolve this case."  [ECF No. 43].

[2] Judge Bredar found that Mr. Wimbush's amended complaint "fail[ed] to state a claim against Wexford for which relief can be granted in connection with its role as a utilization management contractor," as opposed to its role as primary provider of medical services in the Maryland correctional system.  [ECF No. 84].

On August 1, 2014, Mr. Wimbush filed motions for summary judgment against the Corizon Defendants and Wexford, both of whom filed cross-motions. [ECF Nos. 116, 117, 120, 122]. These motions are now ripe for adjudication.[3]  Because the claims against the Corizon Defendants and Wexford overlap, this memorandum opinion addresses both sets of cross-motions for summary judgment.

## II.  FACTS

### A.  Corizon Defendants (pre-July 1, 2012)

Mr. Wimbush has been incarcerated in the Maryland correctional system since April, 2009. Pl. Mot. for Summ. J. against Corizon Defendants ("Pl. Mot. against Corizon Defs.") 6. Prior to his incarceration, Mr. Wimbush sustained a severe fracture in his right ankle, which required surgical repair at the University of Maryland Medical System's Shock Trauma Unit ("UMMS") in June and July, 2008. Corizon Defendants Cross-Mot. for Summ. J. ("Corizon Defs. Cross-Mot."), Exh. 20. The discharge summary noted that Mr. Wimbush had a history with substance abuse. *Id.*  When Mr. Wimbush entered the Maryland Reception, Diagnostic and Classification Center ("MRDCC") on April 26, 2009, he was immediately evaluated for his right ankle pain and assessed by PA Susann Galloway as having chronic pain. *Id.*, Exh. 1-B, p. 8. PA Galloway offered Mr. Wimbush Tylenol 3 (Tylenol with codeine) and Motrin to control his pain until she received his medical records from UMMS and could confirm his pain medications from his primary doctor.[4]  *Id.*  Mr. Wimbush refused the interim medication. *Id.*  PA Galloway referred Mr. Wimbush to the chronic care clinic, and requested that he be provided a bottom bunk. *Id.*  The next day, April 27, 2009, Mr. Wimbush was evaluated by Dr. Sunday Nwosu

---

[3] In September, 2013, all parties consented to proceed before a U.S. Magistrate Judge. [ECF Nos. 97–101]. This case was re-assigned to this Court on August 29, 2014.

[4] UMMS sent Mr. Wimbush's medical records to Correctional Medical Services (Corizon) on January 6, 2010. Corizon Defs. Cross-Mot., Exh. 20, DPSCS-000389-DPSCS-000390.

after requesting pain medication.  *Id.*, pp. 11–12.  Dr. Nwosu prescribed Mr. Wimbush Tylenol 3 for pain relief, and ordered an X-ray of his right ankle and a cane for ambulation.  *Id.*

Mr. Wimbush did not submit any further complaints of pain until November, 2009.  It is unclear from the record whether he was taking Tylenol 3 throughout this time.  On November 30, 2009, Mr. Wimbush submitted two sick call request forms, complaining of his pain, but refused his sick call appointment on December 2, 2009.  *Id.*, Exh. 19.

Mr. Wimbush was transferred to ECI on December 9, 2009.  *Id.*, Exh. 1-B, p. 17.  He was not taking pain medication at the time of the transfer.  *Id.*  Mr. Wimbush was evaluated that day by Nurse Ellen Moyer, who reviewed his medical records from MRDCC and noted his chronic pain.  Pl. Mot. against Corizon Defs., Exh. 9.  Nurse Moyer did not prescribe pain medication. *Id.*  Mr. Wimbush submitted five sick call request forms between December 15, 2009 and December 20, 2009.  *Id.*, Exh. 11.  He complained of his severe ankle pain, and that he "ha[s] not had any medicine since 12-3-09."  *Id.*  On December 22, 2009, PA Stanford responded to Mr. Wimbush's sick call requests, assessed his right ankle pain, and explained to Mr. Wimbush that his "pain med consult" was still pending.  *Id.*  PA Stanford noted that Mr. Wimbush "agree[d] to await consult results."  *Id.*   According to PA Stanford, he did not prescribe pain medication to Mr. Wimbush at this time because he was waiting for the chronic care consult.  *Id.*, Exh. 5, Tr. 96:17-20 (Stanford Deposition).  PA Stanford discussed interim pain management options with Dr. Mathis, the regional supervisor, the next day.  *Id.*, Exh. 11.  On January 13, 2010, PA Stanford noted that Mr. Wimbush's "pain consult" was still pending, and he was considering prescribing Ultram and Elavil, and that he would discuss these possible medications with Dr. Mathis.  *Id.*, Exh. 13.

On January 19, 2010, Nurse Frances Morthole responded to a sick call request form Mr. Wimbush submitted on January 5, 2010. *Id.*, Exh. 14. She ordered high top boots for Mr. Wimbush and prescribed him Naprosyn, a non-steroidal anti-inflammatory medication (NSAID), for pain. *Id.* Nurse Morthole evaluated Mr. Wimbush again on February 2, 2010, after he stated that the Naprosyn was not helping his pain. *Id.*, Exh. 15. She referred Mr. Wimbush to a physician assistant for further evaluation of his pain. *Id.* PA Maryam Messforosh evaluated Mr. Wimbush on February 20, 2010, and instructed him to continue taking Naprosyn and advised him to order an arch support through his housing unit. Corizon Defs. Cross-Mot., Exh. 1-B, p. 28.

On March 3, 2010, Nurse Morthole prescribed Mr. Wimbush Neurotonin, a nerve-pain medication, by submitting a non-formulary drug request that was approved by Dr. Mathis. Pl. Mot. against Corizon Defs., Exh. 16. On March 30, 2010 Mr. Wimbush submitted a sick call request form complaining that the Neurotonin was not working. Corizon Defs. Cross-Mot., Exh. 1-B, p. 31. In response, Dr. Matera evaluated Mr. Wimbush on April 5, 2010. *Id.*, pp. 32–33. Dr. Matera increased Mr. Wimbush's dosage of Neurotonin and advised him to follow an exercise program and refrain from weight or heavy lifting. *Id.* On April 20, 2010, Dr. Matera assigned Mr. Wimbush to a bottom bunk bed and provided him with an elastic brace to help stabilize his ankle. *Id.*, pp. 34–35; Exh. 1-A, ¶ 9.

On June 1, 2010, Dr. Matera evaluated Mr. Wimbush again and noted that "now Neurotonin was helping a lot per [inmate]." *Id.*, Exh. 1-B, p. 36. Because he was on a low dose of Neurotonin, Dr. Matera increased Mr. Wimbush's daily dosage. *Id.*, Exh. 1-A, ¶ 10. Nurse Morthole evaluated Mr. Wimbush on July 6, 2010, and noted that Mr. Wimbush was still experiencing ankle pain and requested a new ankle brace. *Id.*, p. 41. Mr. Wimbush submitted a

sick call request form on July 31, 2010, complaining that his medication was not working. *Id.*, p. 43. When Dr. Matera evaluated Mr. Wimbush on August 3, 2010, Mr. Wimbush requested different shoes, stated that Neurotonin and Naprosyn were not helping, and that Lyrica, a different nerve-pain medication, had helped in the past. *Id.*, pp. 44–45. After examining Mr. Wimbush, Dr. Matera prescribed a 60-day supply of Lyrica, and advised Mr. Wimbush to continue his exercise program and refrain from sports or yard activities. *Id.* Dr. Matera submitted a non-formulary drug request for the Lyrica prescription, which was approved by Dr. Mathis. *Id.*, p. 46.

On September 21, 2010, Mr. Wimbush submitted a sick call request form, complaining that his pain had gotten worse. *Id.*, p. 48. At the time, Mr. Wimbush was prescribed both Lyrica and Neurotonin. *Id.*, pp. 49–50. Dr. Lino Quilo in the chronic care clinic evaluated Mr. Wimbush on September 24, 2010 and renewed his medications. *Id.*, pp. 49–50. Dr. Quilo submitted a non-formulary drug request for a 120-day supply of pregabalin (for which Lyrica is the trade name), which was denied. Pl. Mot. against Corizon Defs., Exh. 21. The same day, in an administrative note, Nurse Jennifer Castanares recorded, "Lyrica non-form request denied."[5] *Id.*, Exh. 23. The next day, Mr. Wimbush submitted a sick call request form requesting Lyrica. Corizon Defs. Cross-Mot., Exh. 1-B, p. 52. In response, PA Stanford saw Mr. Wimbush on September 29, 2010 and noted that Lyrica had been denied. *Id.*, p. 53. Mr. Wimbush submitted three sick call request forms on October 3, 2010, complaining of his pain and requesting Lyrica. *Id.*, pp. 54–56. He did not show up for his sick call appointment with PA Stanford on October 6,

---

[5] Mr. Wimbush finds it especially significant that the name under "Provider" for Nurse Castanares's administrative note was "CMS Medical." *See* Pl. Mot. against Corizon Defs. 13. However, other medical notes written by other nurses also state "CMS Medical" as the "Provider." *See, e.g.*, Corizon Defs. Cross-Mot., Exh. 1-B, pp. 39–40, 60–61, 81.

2010 or October 8, 2010.  Pl. Mot. against Corizon Defs., Exh. 24.  In his no-show notes, PA Stanford wrote that "Lyrica was d/c'ed by Pain Committee see RN note of 9/24/10."  *Id.*

Between October, 2010 and June, 2011, Mr. Wimbush submitted multiple sick call requests forms, all of which were addressed within a few days of submission.[6]  *Id.*, pp. 54–104. During this timeframe, Mr. Wimbush was never again prescribed Lyrica.  He was consistently kept on Neurotonin in varying doses,[7] given several different NSAID medications, provided with a new ankle brace and special elastic stockings, and screened with X-rays of his ankle.  *Id.*  He was also regularly seen by Dr. Quilo in the chronic care clinic.  *Id.*  Mr. Wimbush was transferred to North Branch Correctional Institution ("NBCI") on June 28, 2011.[8]

### B.  Wexford (post-July 1, 2012)

At the time Wexford became the contractual medical services provider for DPSCS inmates, Mr. Wimbush was incarcerated at NBCI and receiving Ultram (a pain medication) and Tegretol (a nerve-pain medication) for his chronic ankle pain.  Pl. Mot. for Summ. J. against Wexford ("Pl. Mot. against Wexford"), Exh. 4.  He was also utilizing an ankle brace and cane. ECF No. 76, Exh. 4, ¶ 5.  On August 10, 2012, Mr. Wimbush was seen by Dr. Colin Ottey, the regional medical director, for a scheduled provider visit, where Mr. Wimbush reported that he was still experiencing pain in his right ankle.  Pl. Mot. against Wexford, Exh. 4.  Dr. Ottey

---

[6] In a sick call appointment on February 10, 2011, PA Stanford noted that he "explained to pt, although scheduled on sick call list, other variables may determine if he is seen i.e., number and severity of other patients on list, time available to PA, medical emergencies anywhere in facility (evening PA on call for annex, east and west medical areas). Apologized if pt felt he was being intentionally overlooked or ignored as that was not the case. Pt expressed understanding."  Corizon Defs. Cross-Mot., Exh. 1-B, p. 78.

[7] In a sick call appointment on May 26, 2011, PA Stanford noted that Mr. Wimbush requested an increase in his morning dosage of Neurotonin, and that he was "tolerating Neurotonin well."  Corizon Defs. Cross-Mot., Exh. 1-B, p. 97.

[8] As discussed in Part IV.A, *infra*, Mr. Wimbush's Eighth Amendment claim against the Corizon Defendants includes only the delay in providing him pain medication at ECI, and the denial of Lyrica, which occurred at ECI. Defendants Dr. Matera and PA Stanford only encountered Mr. Wimbush at ECI.  Thus, the relevant facts for the Corizon Defendants are ones that occurred at ECI.

examined Mr. Wimbush, reviewed his medications, and directed that Mr. Wimbush remain on his current medication regimen. *Id.*, Exh. 4–5.

From August, 2012 to January, 2013, Mr. Wimbush was prescribed both Ultram and Tegretol. *Id.*, Exh. 5. In a chronic care visit with PA Greg Flury on January 7, 2013, Mr. Wimbush reported that he was still experiencing right ankle pain despite the Ultram and Tegretol. Pl. Mot. against Wexford, Exh. 5. Tegretol was subsequently discontinued on February 5, 2013 because Mr. Wimbush "denies benefit." *Id.*, Exh. 6.

On April 14, 2013, Mr. Wimbush was seen by Nurse Kristi Cortez in response to a sick call requesting to be placed on a "new nerve medication." Wexford Cross-Mot. for Summ. J. ("Wexford Cross-Mot."), Exh. 1, p. 17. Mr. Wimbush was kept on Ultram for pain relief. *Id.* On April 24, 2013, PA Flury noted: "Patient case was discussed today in site provider patient care conference with determination from medical director that patient could not receive Lyrica (as patient requests) due to reported ineffectiveness of previous medication." Pl. Mot. against Wexford, Exh. 7. Mr. Wimbush was kept on Ultram for pain relief. *Id.*

On May 6, 2013, PA Flury noted that Mr. Wimbush was "adamant about receiving Lyrica." *Id.*, Exh. 8. PA Flury referred Mr. Wimbush to a physician for a pain management consultation. *Id.* Mr. Wimbush was seen by Dr. Ava Joubert on May 15, 2013. Wexford Cross-Mot., Exh. 1, pp. 26–28. Dr. Joubert's assessment of Mr. Wimbush noted no swelling in his right foot, and the X-ray of his right ankle showed the hardware intact. *Id.* A few days later Mr. Wimbush requested and received new elastic stockings. *Id.* at p. 29. From May, 2013 to September, 2013, Mr. Wimbush was consistently kept on Ultram for pain relief. *Id.* at pp. 23–57.

On September 2, 2013, Mr. Wimbush complained of leg pain to Nurse Amanda Morgan and requested a renewal of Ultram.  Pl. Mot. against Wexford, Exh. 10.  Nurse Morgan noted that "Dr. Ottey was contacted via telephone and unable to renew Tramadol [Ultram]."  *Id.*  At the time, Mr. Wimbush's Ultram prescription was valid until September 11, 2013.  *Id.*  During segregation rounds on September 4, 2013, Mr. Wimbush expressed fear to Nurse Krista Swan that his Ultram prescription was going to lapse.  Wexford Cross-Mot., Exh. 1, p. 62.  In a sick call appointment with Nurse Swan that day, Mr. Wimbush reported pain in both his legs, saying "I need my tramadol [Ultram].  I can't go without it."  *Id.* at p. 63.

On September 5, 2013, Mr. Wimbush reported to PA Flury that his Ultram prescription was pending expiration and he requested a renewal.  *Id.* at p. 64.  PA Flury noted that "the issue was addressed with MD by nursing staff and MD declined to renew med."  *Id.*  On September 7, 2013, Mr. Wimbush stopped Nurse Lisa Shell on segregation rounds and asked her to tell the nurse manager that his Ultram prescription was going to expire on September 11, 2013.  *Id.* at p. 66.  Nurse Shell noted that this issue was addressed by PA Flury two days prior.  *Id.*  On September 9, 2013, Mr. Wimbush stopped Nurse Cortez during segregation rounds to request a renewal of Ultram.  *Id.* at p. 67.  Nurse Cortez noted that Mr. Wimbush recently saw PA Flury who did not renew his prescription.  *Id.*  On September 11, 2013, Nurse Cortez performed a modified sick call evaluation of Mr. Wimbush because of lock down status.  *Id.* at p. 68.  She did not renew his Ultram prescription.  *Id.*

On September 12, 2013, Mr. Wimbush was seen by PA Flury in response to his medication renewal requests.  Pl. Mot. against Wexford, Exh. 14. Mr. Wimbush "denie[d] withdrawal [symptoms] since med expired."  *Id.*  PA Flury explained to Mr. Wimbush that he

would decrease the dosage and alter his treatment regimen.  *Id.*  On September 13, 2013, PA Flury renewed Mr. Wimbush's Ultram prescription at half the dosage.  *Id.*, Exh. 15.

From September 13, 2013, to June, 2014,[9] Mr. Wimbush was consistently kept on Ultram.  Wexford Cross-Mot., Exh 1., pp. 77–180.  There were no other lapses in his Ultram prescription.  *Id.*  In response to varying degrees of pain and symptoms, Mr. Wimbush was also prescribed Tylenol and Neurotonin for pain relief.  *Id.*  He was also consistently provided with an ankle brace, and screened with X-rays of his ankle. *Id.*  He was provided with a cane and special elastic stockings until they were deemed medically unnecessary.  *Id.* at pp. 130, 168–70.  Mr. Wimbush was never prescribed Lyrica at NBCI.[10]

## III.  STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under governing law . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute regarding a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  A party seeking summary judgment bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must show that there is a genuine issue for trial.  *Id.* at 324.

When considering a motion for summary judgment, district courts "must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences

---

[9] Discovery in this case closed June, 2014.  *See* ECF No. 105.

[10] As discussed in Part IV.B.2 and Part IV.C.2, *infra*, Mr. Wimbush's constitutional claims against Wexford pertain only to the denial of Lyrica, and the September, 2013 lapse in his Ultram prescription.

in favor of the nonmovant." *McLean v. Ray*, 488 F. App'x 677, 682 (4th Cir. 2012) (citations and internal quotation marks omitted). A court must "not . . . weigh the evidence and determine the truth of the matter," but rather "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations marks omitted).

## IV.  DISCUSSION

### A.  Inadequate Medical Care

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To establish an Eighth Amendment violation for inadequate medical care, an inmate must demonstrate that the prison official acted with "deliberate indifference to [the inmate's] serious medical needs." *Id.* at 104. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted). This inquiry is objective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In contrast, "deliberate indifference" requires proof of "subjective recklessness" towards the serious medical need. *Id.* at 839–40. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Thus, an inmate must show that "subjectively the officials acted with a sufficiently culpable state of mind." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th

Cir. 2003) (internal quotation marks omitted).   Negligence or medical malpractice will not suffice.   *Estelle*, 429 U.S. at 106.   Rather, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.3d 848, 851 (4th Cir. 1990*), overruled in part on other grounds b*y *Farmer v. Brennan*, 511 U.S. 825 (1994).   That said, "[a]n inmate's mere disagreement with the course of treatment provided by medical officers will not support a valid Eighth Amendment claim."   *Jackson v. Sampson*, 536 Fed. App'x 356, 357 (4th Cir. 2013).

In this case, Dr. Matera and PA Stanford do not deny that Mr. Wimbush's severe and chronic ankle pain comprises a serious medical need.   Pl. Mot. against Corizon Defs., Exh. 4, Tr. 49:13 (Matera Deposition); Exh. 5, Tr. 86:10-12 (Stanford Deposition).   Dr. Matera and PA Stanford acknowledge that Mr. Wimbush will likely always be in some amount of pain, and that no medication can fully alleviate his pain.   Corizon Defs. Cross-Mot. 8.   Thus, the remaining inquiry with regards to the claims against Dr. Matera and PA Stanford is whether either provider acted with deliberate indifference.

### 1.   Delay of Pain Medication

Mr. Wimbush claims that Dr. Matera and PA Stanford's delay in providing him pain medication at ECI constitutes deliberate indifference.   Pl. Mot. against Corizon Defs. 27. Deliberate indifference can be manifested in at least three ways: (1) "by prison doctors in their response to the prisoner's needs;" (2) "by prison guards in intentionally denying or delaying access to medical care;" or (3) by prison guards in "intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104.   Although Mr. Wimbush and the Corizon Defendants dispute whether the delay in providing Mr. Wimbush pain medication was "intentional," the relevant inquiry centers on the "prison doctors in their response to the prisoner's needs."

It is clear from the record that Mr. Wimbush received medical care immediately upon entering MRDCC, and immediately upon being transferred to ECI.  However, it is unclear why Mr. Wimbush was not prescribed any pain medication for over a month after he transferred to ECI, when he previously had been prescribed Tylenol 3 at MRDCC, and his prison medical records consistently document chronic pain.  That Mr. Wimbush "agreed to await to consult results" is no indication that he had any choice in the matter.  It is also unclear from the record whether Mr. Wimbush was taking pain medication throughout his stay at MRDCC. Nevertheless, if Mr. Wimbush was prescribed pain medication at MRDCC, and his medical providers at both MRDCC and ECI acknowledged his chronic pain, there is a genuine dispute as to whether failing to prescribe Mr. Wimbush any pain medication for over a month constitutes deliberate indifference.

The Court notes that because Dr. Matera did not evaluate Mr. Wimbush until April, 2010—after he received pain medication—he cannot be held liable for the delay in prescribing medication.  Hence, this aspect of the claim survives summary judgment only as to PA Stanford.

### 2. Denial of Lyrica

Mr. Wimbush also claims that Dr. Matera and PA Stanford's denial of Lyrica constitutes deliberate indifference.  Pl. Mot. against Corizon Defs. 29.  From the outset, it is important to note that it is not the function of this Court to substitute its judgment on the necessity of a particular medication for that of medical professionals.  *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not subject to judicial review.").  Here, the only relevant inquiry for purposes of an Eighth Amendment claim is whether the denial of Lyrica constitutes deliberate indifference.  "As with any other Eighth Amendment violation, the

[inmate] must demonstrate that the official acted with a sufficiently culpable state of mind . . . ." *Lowery v. Bennett*, 492 Fed App'x 405, 410 (4th Cir. 2012).

To support his claim, Mr. Wimbush primarily relies on three cases from other circuits, all of which can be distinguished from this case.  Pl. Mot. against Corizon Defs. 29–31.  For example, Mr. Wimbush relies on *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990), for the position that "prison officials [are] deliberately indifferent if they denied effective medication." Pl. Mot. against Corizon Defs. 29.  However, the facts in *White* clearly demonstrate that the prison doctor maliciously denied effective medication for the purpose of inflicting harm on the inmates.[11]  There is no evidence, or allegations, of any such malice here.  Also distinguishable is *Arnett v. Webster*, where the Seventh Circuit Court of Appeals found that not providing the plaintiff with a known effective anti-inflammatory medication, or any other substitute medication, for over ten months while the plaintiff's condition worsened stated a claim for an Eighth Amendment violation.  658 F.3d 742, 753–54 (7th Cir. 2011).  Here, while Dr. Matera and PA Stanford did not provide Mr. Wimbush with the specific medication he requested, they did provide alternative pain medications, as well as high top boots, an ankle brace, and special elastic stockings.  Corizon Defs. Cross-Mot., Exh. 1-B, pp. 24, 35, 72, 83.  There is also no indication in the record that Mr. Wimbush's ankle pain worsened after he stopped taking Lyrica; to the contrary, Mr. Wimbush had complained that his ankle pain worsened after he *began* taking Lyrica.  Corizon Defs. Cross-Mot., Exh. 1-B, p. 48.[12]  Mr. Wimbush also relied on *Hathaway v.*

---

[11] In reversing the lower court's 12(b)(6) dismissal of the plaintiffs' Eighth Amendment claims, the Third Circuit explained: "What separates this complaint from ordinary allegations of medical malpractice are (1) allegations that the doctor intended to inflict pain on prisoners without any medical justification and (2) the sheer number of specific instances in which the doctor allegedly insisted on continuing courses of treatment that the doctor knew were painful, ineffective or entailed substantial risk of serious harm to the prisoners."  *White*, 897 F.2d at 109.

[12] In addition, Mr. Wimbush's post-surgery, pre-incarceration medical records from University Specialty Hospital note that he was still in much pain while taking Lyrica.  Corizon Defs. Cross-Mot., Exh. 2, USH000031, USH000032, USH000041.

14

*Coughlin*, where the Second Circuit Court of Appeals sustained a deliberate indifference claim when the prison doctor did not inform the plaintiff of broken pins in his hip or raise the option of surgery to correct it, but rather continued the same course of treatment that proved largely ineffective.   37 F.3d 63, 68–69 (2d Cir. 1994).   Here, in contrast, Mr. Wimbush's medical providers did not deliberately fail to inform him of a medical problem unknown to him, nor did they fail to perform a treatment that would have corrected it.

Mr. Wimbush also cites to several cases from this Circuit to support his assertion that the defendants failed to explain why Lyrica was denied.  Pl. Resp. 5–6.  Mr. Wimbush misses the point, however, because these cases consider explanations, or lack of explanations, of decisions regarding *whether* to treat the inmate for a particular ailment, not *how* to treat the inmate.  *See, e.g.*, *Berkley v. Corizon Maryland*, No. GLR-13-946, 2014 WL 4385357, at *4 (D. Md. Sept. 3, 2014); *Calhoun-El v. Corizon Med. Servs.*, No. RDB-12-2383, 2013 WL 3279998, at *2–3 (D. Md. June 26, 2013); *Jones v. Maynard*, No. RWT-12-2846, 2013 WL 2422902, at *3 (D. Md. May 31, 2013*); Miles v. Adediran*, No. AW-11-3753, 2012 WL 2050800, at *3 (D. Md. June 6, 2012).   As the dissent in *Hathaway* stressed: "'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.'"   *Hathaway*, 37 F.3d at 70 (Jacobs, J., dissenting) (quoting *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987)).

In sum, there is nothing to suggest that the denial of Lyrica, in favor of other medications and forms of treatment, amounts to deliberate indifference.[13]   While Mr. Wimbush may believe Lyrica is the best course of treatment for his pain, "[d]isagreements between an inmate and a

---

[13] Moreover, even if a claim could be stated of some medical official on this basis, Dr. Matera and PA Stanford did not deny the Lyrica prescription.

physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).  There are no exceptional circumstances here.  Thus, this aspect of Mr. Wimbush's deliberate indifference claim against Dr. Matera and PA Stanford fails as a matter of law.

### B.  Supervisory Liability

Mr. Wimbush asserts supervisory liability claims against both Corizon and Wexford.  Pl. Mot. against Corizon Defs. 32; Pl. Mot. against Wexford 10.  To establish supervisory liability under § 1983, Mr. Wimbush must establish: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1999) (internal quotation marks omitted).

### 1.  Corizon

In neither his amended complaint, motion for summary judgment, nor reply does Mr. Wimbush identify a particular Corizon supervisor engaged in allegedly unconstitutional conduct. In his summary judgment motion, Mr. Wimbush asserts that Corizon, as an entity, is liable—akin to a *respondent superior* claim, which does not apply in § 1983 actions.  *Baker v. Lyles*, 904 F.2d 925, 929 (4th Cir. 1990).  In his reply, Mr. Wimbush alleges that, under the circumstances, "someone" must have intervened to deny the order for Lyrica, and that "someone" was deliberately indifferent in doing so.  Pl. Reply against Corizon 12.  Even assuming that the denial of Lyrica amounted to a constitutional injury, Mr. Wimbush's allegation that "some" supervisor

must be liable is clearly insufficient for a § 1983 supervisory liability claim, and thus fails as a matter of law.

### 2.  Wexford

Although Mr. Wimbush failed to name a particular Wexford supervisor in his amended complaint, he appears to charge Dr. Ottey with supervisory liability in his motion for summary judgment.  Pl. Mot. against Wexford 10.  Even if this was a proper way to allege a supervisory liability claim, the claim still fails as a matter of law because Mr. Wimbush did not suffer any constitutional injury while under the care of a Wexford employee supervised by Dr. Ottey.  As previously discussed, the denial of Lyrica, in favor of other forms of medication and treatment, does not amount to deliberate indifference.  *See* Part IV.A.2.  Mr. Wimbush's claim that the lapse in his Ultram prescription amounts to deliberate indifference also fails.  While Mr. Wimbush claims he was deprived of all pain medication in September, 2013, his medical records indicate that his Ultram prescription lapsed for, at most, only two days.  Pl. Mot. against Wexford, Exhs. 13–15.  Moreover, the record does not indicate, nor does Mr. Wimbush describe, any adverse effects from this lapse.  In fact, the day after Mr. Wimbush's prescription lapsed, PA Flury noted that Mr. Wimbush "denied withdrawal [symptoms] since med expired."  *Id.*, Exh. 14.  Such a minor deprivation in treatment, even if Dr. Ottey was aware of it and condoned it, does not amount to deliberate indifference.  *See Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (finding no substantial risk of constitutional injury where an alleged lapse in treatment is "minor and inconsequential").  For reasons discussed, there is no requirement that Dr. Ottey explain or justify this minor lapse, or the decrease in dosage of Ultram.  *See* Part IV.A.2.  Thus, Mr. Wimbush's supervisory liability claim against Dr. Ottey fails as a matter of law.

### C.  Policy and Custom Liability

Mr. Wimbush next asserts policy and custom liability claims against both Corizon and Wexford.  To establish policy and custom liability under § 1983, Mr. Wimbush must prove "the existence of an official policy or custom that is fairly attributable to the [entity] and that proximately caused the deprivation of [his] rights."  *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  "An official policy or custom could include: 1) an express policy or directive; 2) a pervasive and widespread practice; or 3) an inadequate or deliberate failure to train employees in the face of constructive knowledge of employee conduct amounting to a pervasive and unreasonable risk of constitutional injury."  *Hussain v. Univ. of Md. Sys. Corp.*, No. 1:08-CV-1658, 2010 WL 2651287, at *3 (D. Md. June 30, 2010) (citations omitted).

#### 1.  Corizon

Mr. Wimbush argues that the deliberate indifference he experienced—caused by the delay in providing him pain medication and the denial of Lyrica—is attributable to Corizon's policies and procedures relating to chronic pain management, non-formulary drug requests, and the "Pain Committee."  Pl. Mot. against Corizon Defs. 32–34.  In response, the Corizon Defendants assert that DPSCS, not Corizon, promulgated the policies on chronic pain management and non-formulary drug requests, and therefore Corizon cannot be held liable for them.  Corizon Defs. Cross-Mot.  31–32.  According to Joy Lloyd, Corizon's corporate designee, "the policies that [Corizon] adopt[s] are the policies of the State for the contract that we are servicing.  At that time, that was the State of Maryland.  It would have been all of the DPSCS policies."  *Id.*, Exh. 12, Tr. 74:17-21.  Sharon Baucom, DPSCS's corporate designee, explained that DPSCS promulgates policy manuals annually: "There is a pharmacy manual that has information related to medication administration, the nonformulary process, the listing of the

formulary, which includes narcotics, sedatives, hypnotics.  There is [a] sick call manual.  A chronic care manual."  *Id.*, Exh. 13, Tr. 11:20-12:3.  Ms. Baucom clarified that, "Our manuals are broad strokes of clinical, community expectations.  The contractor may feel the need to help their clinicians make clinical decisions by creating a pathway or clinical guidelines that give examples of different steps to take in the event of acute, chronic, severe, moderate pain."  Pl. Mot. against Corizon Defs., Exh. 43, Tr. 19:8-13.  She explained that contractors may have a more specific manual, or "protocol," consistent with the broader manual from DPSCS.  *Id.*, Tr. 19:14-17; *see also* Tr. 19:6-8 ("[DPSCS] does not try to direct the exact clinical care.  We hired a privatized contract[or] for that.")

Based on this testimony alone, it is uncertain whether Corizon's implementation of DPSCS policies satisfies the criteria for a policy and custom liability claim.  Thus, without review of the actual DPSCS policies, and without sufficient information on Corizon's internal protocols, there is a genuine dispute as to which entity promulgated the policies in question.  Considering the Court's finding that the denial of Lyrica does not amount to a constitutional violation, only the policy on chronic pain management is in question; specifically, how and why Mr. Wimbush's chronic care consult was pending for over three months, allegedly causing the delay in prescribing him pain medication.  Finally, although the existence or non-existence of a formal or informal "pain committee" has been the source of much debate between Mr. Wimbush and the Corizon Defendants, such debate is largely inconsequential—even assuming that Corizon promulgated a "pain committee" policy, Mr. Wimbush's claim fails because there was no constitutional violation in discontinuing his Lyrica prescription, much less a "close fit between the unconstitutional policy and the constitutional violation."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

### 2. Wexford

Mr. Wimbush's only indication of a Wexford policy that allegedly caused the constitutional violations he complains of is found in his reply in support of his summary judgment motion, where he argues that Wexford's policy of relying on "stale data," as opposed to "performing an individualized assessment," caused Mr. Wimbush to be denied Lyrica "without any investigation or legitimate justification."   Pl. Reply against Wexford 4.   Mr. Wimbush has presented no facts to support this conclusory allegation.   Even if he had, however, this Court has found that Mr. Wimbush suffered no constitutional injury in being denied Lyrica. Because there is no underlying constitutional violation, Mr. Wimbush's policy and custom liability claim against Wexford fails as a matter of law.

### D. Spoliation

Mr. Wimbush's final argument in his summary judgment motion against the Corizon Defendants is that Corizon allegedly spoliated emails from fall of 2010, which warrants a grant of summary judgment in his favor.   Pl. Mot. against Corizon Defs. 34–35.   This argument fails for several reasons.   In this Circuit, a party seeking sanctions for spoliation must show: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."   *Thompson v. U.S. Dep't of Hous. and Urban Dev.*, 219 F.R.D. 93, 101 (D. Md. 2003).

Mr. Wimbush's spoliation claim is based on the presumed existence of relevant emails from fall of 2010. "[I]n the absence of intentional loss or destruction of evidence, the party must establish that the lost documents were relevant to [his] case." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010) (internal quotation marks omitted). Mr. Wimbush claims the alleged emails would have been relevant "because they either would have explained the denial of Lyrica, or shown there was no appropriate medical justification for that decision." Pl. Resp. 10. Assuming this information is relevant to an Eighth Amendment claim, Mr. Wimbush has failed to show that these emails ever existed. A successful claim for spoliation of evidence cannot be premised on mere speculation on the existence of such evidence. Moreover, assuming the emails existed, the Corizon Defendants did not have a duty to preserve them. *See Silvestri v. Gen'l Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."). Nothing in the record indicates that, prior to Mr. Wimbush filing suit in July 2011, the Corizon Defendants reasonably should have known that emails from fall of 2010 would be relevant to anticipated litigation.

Even if Mr. Wimbush put forth a plausible spoliation claim, summary judgment is not an appropriate sanction absent a showing of bad faith, which is not the case here. *See Victor Stanley,* 269 F.R.D. at 535 ("[D]ispositive or potentially dispositive sanctions are impermissible without bad faith, even if there is considerable prejudice."). For these reasons, Mr. Wimbush's spoliation claim does not warrant summary judgment in his favor.

## V.  CONCLUSION

For the reasons set forth above, Mr. Wimbush's Motion for Summary Judgment against the Corizon Defendants will be denied, and the Corizon Defendants' Cross-Motion for Summary Judgment will be granted in part and denied in part as to Count I in the Amended Complaint [ECF No. 63], granted as to Count II, and granted in part and denied in part as to Count III.  As to Count I, the only remaining dispute is whether the delay in prescribing Mr. Wimbush pain medication at ECI amounts to deliberate indifference on the part of PA Stanford.  As to Count III, the only remaining dispute is which entity promulgated the chronic pain management policy, and how and why Mr. Wimbush's pending chronic care consult allegedly caused the delay in prescribing him pain medication.  Mr. Wimbush's Motion for Summary Judgment against Wexford will be denied, and Wexford's Cross-Motion for Summary Judgment will be granted. A separate Order follows.


Dated:  December 17, 2014

                                                    /s/                        
                                          Stephanie A. Gallagher
                                          United States Magistrate Judge